Gustave Weigend et al., Appellants, v. B. M. Hulsh, Trading as Trojan Products and Manufacturing Company, and William J. Nelson, Appellees.

Gen. No. 42,029.

Heard in the first division of this court for the first district at the October term, 1941. Opinion filed June 1, 1942. Rehearing denied June 16, 1942.

B. M. Steiner, of Chicago, for appellants.

Fred L. Steers, of Chicago, for appellees.

Mr. Justice O.'Connor delivered the opinion of the court.

This action is brought by five plaintiffs each one claiming to have an individual, separate and independent cause of action against the two defendants to recover damages based upon a conspiracy entered into by the two defendants to defraud plaintiffs out of their money. The complaint was in six counts. Defendants moved to strike the several counts and to dismiss the suit on a number of grounds, the first of which was that "There is a misjoinder of plaintiffs because the several causes of action do not arise out

of the same transaction or a series of related transactions, but, on the contrary, are separate and distinct, and neither plaintiffs nor the transactions have any relation with one another.'' The court sustained the motion and struck counts 1, 2 and 5 and ordered that the action as to four plaintiffs, viz: Hurwitz, Ross, Schwartz and Dvorak be dismissed at plaintiffs' costs, and that counts 3 and 4 be dismissed as to defendant Nelson. It was further alleged that the remaining·plaintiff, Weigend, file his answer to defendants' counter claim within 10 days. It is from this order that all plaintiffs appeal.

The substance of each cause of action is that defendants conspired to cheat and defraud plaintiffs out of large sums of money by inducing them to enter into separate agreements for the resale by them of certain merchandise which they bought from defendants. That defendants falsely represented that the value of the merchandise sold plaintiffs, which was to be resold by them, was much greater than its actual value and that the profits which plaintiffs would receive for the resale of the merchandise and the ease with which it might be resold were knowingly false.

The substance of the first count is that plaintiffs at different times entered into agreements with defendant, B. M. Hulsh, doing business as Trojan Products and Manufacturing Co., to act as distributors in the sale and distribution of products manufactured by the company. By each of the five agreements each plaintiff was given a certain territory in which he was to act as exclusive distributor; that the five contracts were entered into on the following dates: Hurwitz, November 9, 1939, Weigend, November 29, 1939, Dvorak, March 9, 1940, Schwartz, April 5, 1940, and Ross, May 21, 1940.

It is further alleged that prior to the execution of these contracts defendants, Hulsh and Nelson, entered into a conspiracy to cheat and defraud plaintiffs

and other persons out of large sums of money and in furtherance of the conspiracy, inserted advertisements in daily papers in Chicago, one of which was: "Help wanted with investment. If unemployed $150.00 invest. can make you $5.00 to $15.00 daily. No mdse. selling. Address FJ143 Tribune." That plaintiffs responding to the advertisement, called at defendants' office and were induced by various misrepresentations and false statements to negotiate and execute agreements with defendant, B. M. Hulsh, doing business as Trojan Products and Manufacturing Co., which would require substantial investments of money from each plaintiff, in consideration of which each plaintiff became a distributor of defendant Hulsh's products in particular territories. The count then alleges 10 misrepresentations made by defendants, the substance of which is that Trojan Products Company was a well established and responsible concern with a great many distributors throughout the United States; that many of the distributors were selling on an average of 50 gallons of shampoo (one of defendants' many products) to wholesale cleaning and dyeing concerns a week; that the distributors were selling large quantities of defendants' products to schools and universities, one of such distributors being named who had sold some of defendants' products for $2,000 to Purdue University. That there was great demand for a person to be assigned to a particular territory which was of great value; that each distributor had employed from 5 to 10 men, on the basis of 50 per cent commission and that such employees were each averaging $10 a day "in cleaning or shampooing rugs or carpets with the use of said defendants' 'Rug-O-Vator' machine." That defendants' products were advertised extensively by radio, including W. M. A. Q., and others; that defendants' products were uniformly priced; that defendant, Hulsh, had invented or created, as a result of extensive experiments, a new compound to be used in cleaning or shampooing rugs, which contained no

soap, which could be used with one of defendants' machines to great advantage; that the value of the territory assigned to each plaintiff, as distributor, was worth from $2,000 to $5,000, but that if each plaintiff would purchase from $1,000 to $3,000 worth of merchandise it would be unnecessary to pay defendants any sum for exclusive territory.

It was further alleged that each plaintiff relied upon the representations made by defendants, as a result of which plaintiff, Weigend, was induced to give Hulsh $3,000 for merchandise and to be assigned to the State of Minnesota; that he expended other large sums of money in an endeavor to sell and distribute the merchandise but to no avail, and claimed $3,500 damages. That plaintiff, Hurwitz, paid defendant, Hulsh, $1,800 to have himself and M. W. Johnson assigned to Chicago and Evanston, and for certain merchandise and equipment to be resold in such territory; that he expended other large sums of money in an endeavor to sell and distribute the products, without success, and his damages were laid at $3,000; that plaintiff, Ross, was induced to pay Hulsh $1,000 for certain of defendants' products and was assigned to portions of Kentucky and Indiana; expended other large sums of money and he claimed $2,000 damages; that plaintiff, Schwartz, paid defendant, Hulsh, $1,000 for certain merchandise and equipment for resale in Oak Park, River Forest, Forest Park, Maywood and Melrose Park and expended other sums of money in an endeavor to sell and distribute the products. His damages were laid at $2,000. That plaintiff, Dvorak, was induced to pay Hulsh $600 for merchandise and equipment for resale in Will county, Illinois; that he expended other large sums of money in a vain effort to dispose of the goods, and his damages were laid at $1,600.

Counts 2, 3 and 4, adopted by reference substantially all of count 1 and had to do particularly with plaintiff, Weigend's, claim, going into more detail in ref-

erence to his claim than did count 1; and in count 3 the written agreement entered into between Hulsh and Weigend was attached to and made a part of the count. Count 5 purports to set up plaintiff, Hurwitz's, cause of action based on the contract entered into by defendant, Hulsh, with Hurwitz and Johnson. Attached to and made a part of this count was a written contract entered into between the Trojan Products Company, by William J. Nelson, general sales' agent, and plaintiff, Hurwitz, and M. W. Johnson, which contract, among other things, is to the effect that the products company had theretofore sold some of its products to a number of persons and concerns in and about Chicago and that it would continue to sell other goods to them, but on which Hurwitz and Johnson would be entitled to a certain commission. The total commission claimed under this special agreement was $849.40. It was further alleged that upon the execution of this contract, plaintiff, Hurwitz, and Johnson, became partners in the sale and distribution of defendants' products. That afterward, July 19, 1940, the partnership was dissolved and the proceeds became the property of Hurwitz; that he was entitled to have paid to him such commissions, and his damages in that count are laid at $3,000.

Count 6 adopted practically all of count 1 and was in reference to the claim of plaintiff, Schwartz. He claimed $2,000 damages.

The right to join the five plaintiffs in one suit is claimed by virtue of section 23 of the Civil Practice Act (ch. 110, Ill. Rev. Stats. 1941 [Jones Ill. Stats. Ann. 104.023]). That section provides: "Subject to rules, all persons may join in one action as plaintiffs, in whom any right to relief in respect of or arising out of the same transaction or series of transactions is alleged to exist, whether jointly, severally or in the alternative, where if such persons had brought separate actions any common question of law or fact

would arise; Provided, that if upon the application of any party it shall appear that such joinder may embarrass or delay the trial of the action, the court may order separate trials or make such order as may be expedient, and judgment may be given for such one or more of the plaintiffs as may be found to be entitled to relief, for the relief to which he or they may be entitled.

"If any one who is a necessary plaintiff declines to join, he may be made a defendant, the reason therefor being stated in the complaint." This section of our Practice Act, except the first three words, "Subject to rules," is identical with section 209 of the Civil Practice Act of New York. That section was construed by the courts of New York in *Akely v. Kinnicutt*, 238 N. Y. 466, affirming 208 App. Div. 487 (203 N. Y. S. 741). The court in beginning its opinion said: "This case involves the interpretation of a new and rather revolutionary provision of the Civil Practice Act." The trial court, the Appellate Division and the Court of Appeals of New York all held that 193 plaintiffs might join in one action, "each one claiming to have an individual, separate and independent cause of action against the defendants for damages caused by the fraud of the latter." And continuing the Court of Appeals said: "The substance of each cause of action is that the defendants, with others, conspired to organize a corporation and then to float its stock at much more than its actual value; that in pursuance of this conspiracy they caused to be prepared a prospectus which was widely circulated throughout the country and which was intended to induce those who read it or learned of its contents to buy the stock at a price much higher than its actual value, and that this prospectus thus issued was intentionally false and fraudulent and misrepresented the value of the stock; that the plaintiff (in each cause of action) either seeing and relying upon the

truthfulness of the prospectus or relying upon the advice of some one who had seen and believed it was induced to buy at a given date a certain number of shares of the stock in question at a price far in excess of its actual value and each alleged cause of action seeks to recover from defendants the damages thus suffered.'' The court then quoted § 209 of the Civil Practice Act of that State, and continuing said (p. 472) ''The statute before us is substantially a copy of a provision in the English Practice Act and of course its purpose is to lessen the delay and expense of litigation by permitting the claims of different plaintiffs to be decided in one action instead of many when, although legally separate and distinct, they nevertheless so involve common questions and spring out of identical or related transactions that their common trial may be had with fairness to the different parties. The statute is a remedial one in promotion of the purpose in these times so insistent and widespread that the delays and expenses of litigation shall be lessened where possible and as such it is to be liberally construed. . . . It is ''earnestly argued by counsel whether the causes of action which have been joined in this complaint do involve such a common question of law or fact as justifies the court in permitting them to be united in one complaint. It is necessarily admitted by the defendants that they do involve some common questions of law and fact but it is insisted that these common questions when compared with all of the questions which must be determined in each case are not of such comparative weight or importance as to justify the union which is being attempted. We are not able to agree with this view. We do not need to hold that the presence in each cause of action of some common but inconsequential or theoretical issue would be a sufficient reason for assembling in one complaint nearly two hundred causes of action. We shall assume in this case that such common questions must be of sub-

stantial importance as compared with all of the issues and that the question of the comparative weight and importance of common and separate issues involved in each cause of action is quite largely a matter of judgment. But even on that theory we do not think that it can be said by us as a matter of law in this case that there are not present in each cause of action common issues which amply satisfy the test of the statute. The common issues are basic and would seem to be the ones around which must revolve the greatest struggle and to which must be directed the greatest amount of evidence. These are in the ones in substance whether the defendants conspired to organize a corporation and float its stock at much more than its real value and whether in pursuance of this conspiracy they fraudulently issued a prospectus showing the stock to be much more valuable than it really was, and whether they did this with the deliberate intent to cheat and defraud the public into buying the stock at an unconscionable value. These questions are common to every cause of action. The separate issues which must be tried in each instance will be in the main whether the plaintiff saw the prospectus or learned of its representations, was influenced thereby and at a certain date bought a certain amount of stock at a certain price in advance of its real value in reliance thereon. While these latter may equal in number the common ones it seems from the face of the complaint, by which we must decide the question, that the majority of them cannot involve much evidence or lengthy dispute, but that the trial of them will yield in contentious importance and difficulty to the questions which have been first suggested and that, therefore, this is a case which comes well within the meaning of the statute so far as relates to common questions. . . .

". . . Each cause of action is based upon a purchase of stock at a fictitious value in reliance upon representations, as alleged, of defendants in respect

of the value of that stock which were untrue and fraudulent and made for the purpose of inducing the public including plaintiff to make such purchases. The transaction in respect of or out of which the cause of action arises is the purchase by plaintiff of his stock under such circumstances, and such purchases conducted by one plaintiff after another respectively plainly constitute a series of transactions within the meaning of the statute. The purchase by a plaintiff of his stock is not robbed of its character as a 'transaction' because, as appellants seem to suggest, the transaction was not a dual one occurring between the plaintiff and the defendants, and the many purchases by plaintiffs respectively do not lose their character as a series of transactions because they occurred at different places and times extending through many months.''

That case was decided on the pleadings as is the case at bar and we think what is said by the New York Court of Appeals is in point and applicable to the facts as alleged in the complaint before us. The section construed by the New York court and § 23, of our Civil Practice Act are identical. Here five plaintiffs at different times, each entered into a contract with defendant, Hulsh, doing business as Trojan Products and Manufacturing Co. It is alleged that false representation was made by defendants to each plaintiff. For this reason the court erred in holding there was a misjoinder of parties plaintiff. See also *Baker v. Healy Co.*, 302 Ill. App. 634. The purpose and spirit of our Civil Practice Act must be kept in mind when construction of it is involved. Section 1, of the Act provides that it shall be applicable "to all civil proceedings, both in law and in equity, unless their application is otherwise herein expressly limited." By § 4, it is provided, "This Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive

rights of the parties, and the rule that statutes in derogation of the common law must be strictly construed shall not apply to this Act or to the rules made pursuant thereto." And section 31 provides, "Neither the names heretofore used to distinguish the different ordinary actions at law, nor any formal requisites heretofore appertaining to the manner of pleading in such actions respectively, shall hereafter be deemed necessary or appropriate, and there shall be no distinctions respecting the manner of pleading between such actions at law and suits in equity, other than those specified in this Act and the rules adopted pursuant thereto." Section 33 provides, "All pleadings shall contain a plain and concise statement of the pleader's cause of action." By section 40 the general issue is abolished and it is provided that allegations of pleadings shall be specific. Section 42 provides, "No pleading shall be deemed bad in substance which shall contain such information as shall reasonably inform the opposite party of the nature of the claim or defense which he is called upon to meet.

"All defects in pleadings, either in form or substance, not objected to in the trial court, shall be deemed to be waived." And by section 44 it is provided, "Subject to rules any plaintiff or plaintiffs may join any causes of action, whether legal or equitable or both, against any defendant or defendants; . . . But the court may, in its discretion, order separate trials of any such causes of action or counterclaims if they cannot be conveniently disposed of with the other issues in the case. Legal and equitable issues may be tried together where no jury is employed."

Having in mind the purpose of our Practice Act, we agree with what the New York court said in the *Akely* case that: "The statute is a remedial one in promotion of the purpose in these times so insistent

and widespread that the delays and expenses of litigation shall be lessened where possible and as such it is to be liberally construed.''

Counsel for defendants contends that count 5 is insufficient because it alleges that Hurwitz and Johnson entered into an agreement with defendant, Hulsh, and that by reason thereof, Hurwitz and Johnson were entitled to certain commissions and that later it is alleged that Hurwitz and Johnson dissolved partnership and that Hurwitz is entitled to recover the commissions, but counsel points out that there is no allegation that Hurwitz and Johnson complied with section 22 of the Civil Practice Act. We think this section has no application. *Bank of Montreal v. Page,* 98 Ill. 109; *Heartt v. Walsh,* 75 Ill. 200.

The order of the superior court of Cook county appealed from is reversed and the matter remanded for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*

McSurely, P. J., concurs.

Mr. Justice Matchett specially concurring: I think the first count stated independent causes of action which could be properly joined under section 23 of the Civil Practice Act. It was error to dismiss the suits as to the four plaintiffs. It was in the discretion of the court to order separate trials and make such order as may be expedient. See sections 23 and 44 of the Civil Practice Act.